IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

JEFFREY GOOD,

Plaintiff,

vs.                                                    Case No. 21-02539-JAR-ADM

UNITED STATES DEPARTMENT OF
EDUCATION, ET AL.,

Defendants.

## MEMORANDUM IN SUPPORT OF DEFENDANT UNITED STATES DEPARTMENT OF EDUCATION'S MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(1) & 12(b)(6)

Defendant United States Department of Education (USDOE), by and through Duston J. Slinkard, Acting United States Attorney for the District of Kansas, and Steven W. Brookreson, II and Christopher Allman, Assistant United States Attorneys, submits this memorandum, pursuant to D. Kan. Rules 7.1 and 7.6, in support of its motion to dismiss Plaintiff's complaint under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction, or alternatively under Fed. R. Civ. P. 12(b)(6) for failure to state a claim.

## NATURE OF THE CASE

### I.    PROCEDURAL HISTORY AND PLAINTIFF'S ALLEGATIONS AGAINST DEFENDANT USDOE

On November 1, 2021, Plaintiff filed a civil action in the District Court for Johnson County, Kansas ("State Court").  State Court Pet. for Damages, Doc. 5, at 3.  In his State Court Petition, Plaintiff names the USDOE alongside Transunion LLC and the Higher Education Loan Authority of the State of Missouri (MOHELA) as defendants to Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.* (FCRA) claims for which he seeks actual, statutory, and punitive damages, as well as attorney's fees, costs, pre-judgment, and post judgment interest.  Doc. 5, at 3, 7-14.  USDOE

received a copy of the State Court summons and Petition on November 9, 2021.  Receipt of certified mail, Doc. 3, 68.  On November 19, 2021 USDOE removed Plaintiff's State Court action to this Court pursuant to 28 U.S.C. § 1442(a)(1).  Notice of Removal, Doc. 1.

Plaintiff alleges that on an unspecified date he "discovered errors on each of his credit reports, provided by Experian, Equifax, and Trans Union." Doc. 5, at 5.  Plaintiff alleges that his credit report inaccurately reflected "two delinquent tradelines simultaneously for the same account, for four different accounts, which dramatically, improperly suppresses Plaintiff's credit score." *Id*. at 6.  Plaintiff alleges that he disputed the accuracy of the credit reports, requested reinvestigation, and requested the description of the procedure used to determine the accuracy and completeness of the information. *Id*.  On April 28, 2021, Plaintiff alleges that MOHELA "responded as a servicer and representative of Defendant USDOE, refusing to correct the disputed reporting." *Id*.  Thereafter, Plaintiff states that both Experian and Equifax corrected the issue, but TransUnion failed to do so. *Id*.

As to USDOE, Plaintiff alleges that USDOE violated the FCRA by its "refusal to conduct an investigation of Plaintiff's disputes", "refusal to review all relevant information concerning Plaintiff's account" or alternatively "failing to report the results of its review / investigation to the consumer reporting agencies: USDOE's alleged "[i]ntentional failure to report the accurate status of Plaintiff's account information to the credit reporting agencies"; "[i]ntentional failure to properly participate, investigate, and comply with reinvestigations conducted by the credit reporting agencies regarding Plaintiff's disputes"; and "continuing to furnish and disseminate inaccurate and derogatory credit, account, and other information regarding Plaintiff to the credit reporting agencies despite actual knowledge of these inaccuracies. *Id.* at 13.

## II.    BACKGROUND TO THE FCRA

### A.    Relevant History of the FCRA

As originally enacted in 1970, the FCRA principally imposed duties only on "consumer reporting agencies." *E.g.*, 1970 Act, § 602, 84 Stat. 1128.  Those are entities engaging in "assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties." § 603(f), 84 Stat. 1129; see §§ 604-605, 607-614, 84 Stat. 1129-1133.  Congress's express goal in imposing those duties was "to require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit … in a manner which is fair and equitable to the consumer" and with "respect for the consumer's right to privacy." § 602(a)(4) and (b), 84 Stat. 1128; *see TRW Inc. v. Andrews*, 534 U.S. 19, 23 (2001).  In its remedial provisions, the 1970 Act imposed civil liability on "[a]ny consumer reporting agency or user of information" that violated FCRA's provisions, including punitive damages and costs for willful violations. §§ 616-617, 84 Stat. 1134.  It also imposed criminal liability on officers and employees of consumer reporting agencies who disclosed consumer information without authorization. § 620, 84 Stat. 1134.

The 1970 Act contained one provision imposing duties on a "person" and one provision imposing liability on a "person."  Section 606 imposed certain conditions on when a "person" could "procure or cause to be prepared an investigative consumer report on any consumer." § 606(a), 84 Stat. 1130; *see* § 606(b), 84 Stat. 1130.  And Section 619 imposed criminal liability on "[a]ny person" obtaining consumer information "under false pretenses." § 619, 84 Stat. 1134.  The 1970 Act defined "person" to include "any individual, partnership, corporation, trust, estate, cooperative, association, government or governmental subdivision or agency, or other entity." § 603(b), 84 Stat. 1128.  The 1970 Act did not otherwise contain any substantive or remedial

provisions applying to "persons," as opposed to "consumer reporting agencies" or "users of information."  Instead, the statute used "person" or "persons" only in provisions imposing duties on consumer reporting agencies. *E.g.*, § 604(3), 84 Stat. 1129 (identifying circumstances in which a consumer reporting agency may furnish a consumer report to a "person"); § 613(1), 84 Stat. 1133 (requiring consumer reporting agencies to make disclosures to consumers about "the name and address of the person to whom [certain] information is being reported"); *see, e.g.*, §§ 607, 610-612, 615, 620, 84 Stat. 1130-1134.

In 1996, Congress amended the FCRA by expanding its regulatory focus from consumer reporting agencies to include persons who furnish information to those agencies and who use credit reports. *See* Consumer Credit Reporting Reform Act of 1996 (1996 Act), Pub. L. No. 104-208, Div. A, Tit. II, Subtit. D, Ch. 1, 110 Stat. 3009-426.  As relevant here, a newly enacted provision obligated a "person" to conduct an investigation and take specific steps "[a]fter receiving notice … of a dispute with regard to the completeness or accuracy of any information provided by [the] person to a consumer reporting agency." Sec. 2413, § 623(b)(1), 110 Stat. 3009-448; *see* 15 U.S.C. § 1681s-2(b)(1).  The 1996 Act also amended FCRA's remedial provisions to apply to "[a]ny person," not just to "[a]ny consumer reporting agency or user of information." 1996 Act, Sec. 2412(a) and (d), 110 Stat. 3009-446; *see* 15 U.S.C. §§ 1681n and 1681o.  It also added provisions for statutory damages and attorney's fees. 1996 Act, Sec. 2412(b), (c), and (e), 110 Stat. 3009-446 to 3009-447; *see* 15 U.S.C. §§ 1681n and 1681o.  And it authorized both the Federal Trade Commission (FTC) and state governments to bring actions against "person[s]" who violate FCRA,

including to obtain damages and injunctive relief. 1996 Act, Secs. 2416 and 2417, 110 Stat. 3009-450 to 3009-452; *see* 15 U.S.C. § 1681s.[1]

## B.    Relevant Application of FCRA

The FCRA exists "to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." *Safeco Ins. Co. v. Burr*, 551 U.S. 47, 52 (2007). As part of this regulatory scheme, the FCRA imposes two statutory duties on those who furnish credit information to consumer reporting agencies: (1) § 1681s-2(a) requires furnishers to provide accurate information; and (2) § 1681s-2(b) requires furnishers to undertake an investigation upon receipt of a notice of dispute regarding credit information that is furnished. 15 U.S.C. § 1681s–2; *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1153 (9th Cir. 2009); *Green v. RBS Nat'l Bank*, 288 F.App'x 641, 642 (11th Cir. 2008); *Scott v. First S. Nat'l Bank*, 936 F.3d 509, 517 (6th Cir. 2019). The § 1681s-2(a) duties are only enforceable by federal or state agencies. *Gorman*, 584 F.3d at 1154 (citing 15 U.S.C. § 1681s-2(c) and (d)).

Section 1681s-2(b) enumerates five furnisher duties that are triggered when a furnisher receives notice[2] from a consumer reporting agency that a consumer has filed a dispute with the

---

[1]    The Bureau of Consumer Financial Protection now shares that enforcement authority with the FTC. *See* DoddFrank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, Tit. X, Subtitle. H, § 1088(a)(10), 124 Stat. 2088-2090 (15 U.S.C. 1681s(b)(1)(H)).)

[2]    Notice directly from the consumer to a furnisher does not trigger a furnisher's duty to investigate. *See* 15 U.S.C. § 1681i(a)(2) (providing that once a "consumer reporting agency receives notice of a dispute from any consumer…the agency shall provide notification of the dispute to any person who provided any item of information in dispute"); *see also SimmsParris v. Countrywide Fin. Corp.*, 652 F.3d 355, 358 (3d Cir. 2011) ("Notice under § 1681i(a)(2) must be given by a credit reporting agency, and cannot come directly from the consumer."); *Gorman*, 584 F.3d at 1154 ("[Section 1681s–2(b)] obligations are triggered upon notice of dispute—that is, when a person who furnished information to a CRA receives notice from the CRA that the consumer disputes the information." (internal quotation marks omitted)).

CRA about information in the consumer's credit report.[3] *Gorman*, 584 F.3d at 1154 (citing 15 U.S.C. § 1681s-2(b)(1) and *Nelson v. Chase Manhattan Mortgage Corp.*, 282 F.3d 1057, 1059-60 (9th Cir. 2002)).  Section 1681s-2(b) provides that after receiving notice of a dispute from a CRA, the furnisher shall:

> (A) conduct an investigation with respect to the disputed information;
> (B) review all relevant information provided by the [CRA] pursuant to section 1681i(a)(2) of this title;
> (C) report the results of the investigation to the [CRA];
> (D) if the investigation finds that the information is incomplete or inaccurate, report those results to all other [CRAs] to which the person furnished the information and that compile and maintain files on consumers on a nationwide basis; and
> (E) if an item of information disputed by a consumer is found to be inaccurate or incomplete or cannot be verified after any reinvestigation under paragraph (1), for purposes of reporting to a [CRA] only, as appropriate, based on the results of the reinvestigation promptly—
> > (i) modify that item of information;
> > (ii) delete that item of information; or
> > (iii) permanently block the reporting of that information.

15 U.S.C. § 1681s-2(b)(1)(A)-(E).  Here, Plaintiff claims that USDOE and MOHELA failed to comply with §§ 1681s-2(a) and 1681s-2(b)(A)-(E).

Sections 1681n and 1681o of the FCRA create a private right of action for willful or negligent noncompliance with the FCRA's requirements.  The private right of action against furnishers is limited to violations of § 1681s-2(b). *See* 15 U.S.C. § 1681s-2(c); *see also Gorman*, 584 F.3d at 1154; *Seamans v. Temple Univ.*, 744 F.3d 853, 865 (3d Cir. 2014) (maintaining that "where a given notice contains only scant or vague allegations of inaccuracy, a more limited investigation may be warranted."); *Galper v. JP Morgan Chase Bank, N.A.*, 802 F.3d 437 (2d Cir. 2015); *see also Boggio v. USAA Fed. Sav. Bank*, 696 F.3d 611, 614 (6th Cir. 2012) ("If at some

---

[3]   When a CRA receives a consumer's dispute, the CRA is required to provide a notice of the dispute and all relevant information about the dispute to the appropriate furnisher. 15 U.S.C. § 1681i(a)(2).

point a CRA discovers that either the 'completeness or accuracy' of a consumer's information is in dispute—and provided that it does not determine the dispute to be 'frivolous or irrelevant'—that CRA will then notify the original furnisher and provide it with 'all relevant information regarding the dispute.'").

FCRA is silent as to the precise duty of care required in performing the furnisher's investigation. *See Akalwadi v. Risk Mgmt. Alternatives, Inc.*, 336 F.Supp.2d 492, 510 (D. Md. 2004). However, courts have concluded that the FCRA requires creditors faced with a consumer dispute to conduct a "reasonable investigation" of their records to determine whether the disputed information can be verified. *See e.g.*, *Stewart v. Equifax Info. Services, LLC*, 320 F. Supp. 3d 1186, 1200 (D. Kan. 2018):

> [T]he Tenth Circuit requires a furnisher to undertake a " 'reasonable' investigation" of the dispute, *i.e.*, " 'one that a reasonably prudent person would undertake under the circumstances.' " *Maiteki*, 828 F.3d at 1275 (quoting *Boggio*, 696 F.3d at 616). Plaintiff provides no authority concluding that a reasonable investigation of a dispute requires a furnisher to track the dispute for 30 days and then provide updated information to a CRA if it receives more information after making a report to the CRA. Indeed, our Circuit even recognizes that "an investigation does not have to be exhaustive to be reasonable." *Maiteki*, 828 F.3d at 1276.

*Stewart*, 320 F. Supp. 3d at 1202–03 (summary judgment in favor of furnisher on FCRA claim on duty of reasonable investigation may be appropriate if the reasonableness of furnisher's procedures are beyond question.); *Johnson v. MBNA Am. Bank, N.A.*, 357 F.3d 426, 431 (4th Cir. 2004); *Farren v. RJM Acquisition Funding, LLC*, No. 4-cv-995, 2005 WL 1799413, at *4 (E.D. Pa. July 26, 2005). That said, § 1681s-2(b) "does not require . . . any data furnisher to take extraordinary means to investigate and *discover* disputed information but rather calls for a more passive investigation where the data furnisher is determining only that the information provided to it matches the information in its records." *Farren*, 2005 WL 1799413, at *7 (emphasis in original).

[S]ummary judgment is proper if 'the reasonableness of the defendant's procedures is beyond question.'" *Westra v. Credit Control of Pinellas*, 409 F.3d 825, 827 (7th Cir. 2005).

Furthermore, a plaintiff must make a prima facie showing of inaccurate information on a consumer credit report. *See Sarver v. Experian Info. Sols., Inc.*, 299 F. Supp. 2d 875, 876 (N.D. Ill.), *aff'd sub nom. Sarver v. Experian Info. Sols.*, 390 F.3d 969 (7th Cir. 2004); *McKeown v. Sears Roebuck & Co.*, 335 F. Supp. 2d 917 (W.D. Wis. 2004); *Carvalho v. Equifax Information Servs., LLC*, 629 F.3d 876, 890 (9th Cir. 2010) (citing *Dennis v. BEH-1, LLC*, 520 F.3d 1066, 1069 (9th Cir. 2008)).

## III.   BACKGROUND AS TO USDOE'S STUDENT LOAN PROGRAM

USDOE is an executive department within the United States federal government that was created in 1980 "to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access."[4]  USDOE administers the William D. Ford Federal Direct Loan Program (FDLP), under which it makes loans to enable students and parents to pay the costs of attendance at postsecondary schools. *See* 20 U.S.C. § 1087a; 34 C.F.R. 685.100 *et seq.*

Under these loan programs and pursuant to the Higher Education Act of 1965, as amended ("HEA"), 20 U.S.C. § 1070, *et seq.*, USDOE enters into agreements with each credit reporting agency—such as TransUnion[5], Equifax, and Experian—to "exchange information" concerning the credit worthiness student loan borrowers. *See* 20 U.S.C. § 1080a(a); 34 C.F.R. 682.208(b),

---

[4]   https://www2.ed.gov/about/landing.jhtml (last visited Nov. 11, 2021).

[5]   Co-defendant Transunion LLC is a credit reporting agency (also called a "consumer reporting agency" or "credit bureau"), but also markets itself as a "global information and insights company" *See* https://www.transunion.com/about-us/about-transunion (last visited Nov. 11, 2021).

682.410(b)(5), 682.205(a)(1)(ix) (Federal Family Education Loan Program); 20 U.S.C. § 1087a(b)(2) (Direct Loans) and 20 U.S.C. § 1087cc; 34 C.F.R. 674.31(b)(1), 674.45(a)(1) (Perkins Loans).[6]

To assist consumer reporting agencies in complying with the FCRA, these "agreements may provide for timely response by" USDOE to requests for information from consumer reporting agencies based on "objections by borrowers." *See* 20 U.S.C. § 1080a(a); *see also* 34 C.F.R. § 682.208(a) ("The loan servicing process includes reporting to nationwide consumer reporting agencies, responding to borrower inquiries, establishing the terms of repayment, and reporting a borrower's enrollment and loan status information."); *see also* 20 U.S.C § 1087e(a) (incorporating this servicing arrangement into newer loan programs). These provisions of the HEA statutes also limit the time in which a credit reporting agency may include information about student loans on a credit report, which would otherwise be governed by the FCRA, 15 U.S.C. 1681c. In general, FFEL and Direct loans should not be reported by a credit reporting agency longer than 7 years after default. 20 U.S.C. § 1080a(f); 15 U.S.C. § 1681c(a).

A borrower's federal loan servicer is the entity that engages in credit reporting for borrowers on a monthly basis. *See* Cristin Bulman Declaration. Exhibit O, ¶ 11.[7] When a borrower

---

[6]   While the FDLP does not have a specific provision covering credit reporting, 20 U.S.C. § 1087e(a), which covers the FDLP, does provide that "loans made to borrowers under this part shall have the same terms, conditions, and benefits . . . as loans made to borrowers under sections 1078…." (Federal Family Education Loan Program statutes). Thus, 20 U.S.C. § 1080a(a) applies to the FDLP, and therefore, USDOE is required to report the repayment status of these loans to collection agencies.

[7]   *See also* Federal Student Aid, *Loan Servicing Contracts*, https://studentaid.gov/data-center/business-info/contracts/loan-servicing (wherein credit reporting is part of a servicer's contractual administrative duties) (last visited December 13, 2021); *See also* 20 U.S.C. § 1082(a)(1) giving the Secretary the authority to regulate third-party student loan servicers such as MOHELA. Federal law also provides that the USDOE "may enter into contracts for ... the servicing and collection of [Direct Loans]." 20 U.S.C. § 1087f(b)(2).

is in repayment, the account status indicates whether the loan is current or past due. *Id.*  Generally, the loan is current if it is less than 90 days past due, but this can vary by loan type. *Id.*[8]  Loans that are consolidated or paid in full by the borrower are generally shown as "Paid or Closed Account/Zero Balance." *Id.*[9]  Loans that are transferred or defaulted are generally shown as "Account Transferred." *Id.*[10]  Once the loan closes, it is generally reported one final time indicating that the loan is closed and noting the reason for closure. *Id.*[11]

USDOE is considered a data furnisher for credit reporting purposes. *Id.* at ¶ 12.  USDOE, through its loan servicers, submits student-loan data to all credit reporting agencies monthly via e-OSCAR, which is a system designed to ensure compliance with FCRA. *Id.* at ¶¶ 11, 13-15.[12]  The data USDOE reports to credit reporting agencies includes the date the debt was opened, original loan amount, debt type, repayment status, delinquency date, if any, debt balance, and monthly payment information. *Id.* at 11.  Borrowers can submit credit reporting disputes directly to USDOE or to the credit reporting agencies. *Id.*; s*ee, e.g.*, Doc 5, 5 ("On or about April 20, 2021, Plaintiff sent a dispute to each of the three credit bureaus and to defendant MOHELA, as servicer and

---

[8]    See also, OUSDOE's loan servicers' public explanation about what information is generally reported to the credit bureaus.  At the top of each webpage states "Official Servicer of Federal Student Aid.":
      https://www.mohela.com/DL/resourceCenter/UnderstandingCredit.aspx;
      https://www.nelnet.com/credit-reporting;
      https://navient.com/in-repayment/credit-reporting; and
      https://schools.mygreatlakes.org/educate/knowledge-center/credit.html   (last   visited December 13, 2021);

[9]    *Id.*

[10]    *Id.*

[11]    *Id.*

[12]    See also, generally https://www.e-oscar.org/getting-started/about-us (last visited Nov. 11, 2021); https://www.e-oscar.org/getting-started/enrollment-benefits (last visited Nov. 11, 2021) (describing the benefits of the e-OSCAR system).

representative for USDoE, disputing the reporting on his credit report.")  Disputes sent to the credit reporting agencies are then sent electronically to USDOE through e-OSCAR using an Automated Credit Dispute Verification ("ACDV").  *Id*. at ¶ 15.  Disputes sent directly to ESDOE are communicated to the credit reporting agencies via the Automated Universal Dataform ("AUD") Process, when appropriate. *Id*.

If a borrower initiates a credit history dispute with a credit reporting agency, the agency uses e-OSCAR to send an ACDV to a data furnisher, such as USDOE. *Id*. at ¶ 16.  With rare exceptions, ACDVs do not transmit the credit dispute documentation supplied by the borrower to data furnishers, but instead convey dispute-related information through a limited number of dispute codes. *Id*.  ACDVs initiated by a credit reporting agency on behalf of a consumer are routed to the appropriate data furnisher based on the credit reporting agency and subscriber code affiliations indicated by the data furnisher. *Id*.  Each ACDV has a unique control number. *Id*.  Thereafter, a data furnisher like USDOE conducts its investigation by verifying the accuracy of tradeline information contained in a consumer's credit report. *Id*.  When the loan servicer receives an ACDV, it generally reviews the loan account in its entirety, including, but not limited to, the account status for the borrower, payments made, financials, demographics, options such as deferments and forbearances, and other account activity. *Id*.  The loan servicer then compares the information it received in the ACDV to what is in their system and corrects and updates any data field information that is either incorrect or outdated. *Id*.  Any corrected or updated information is sent from the loan servicer back to the initiating credit bureau via e-OSCAR. *Id*.  If an account is modified or deleted, electronic copies of the information contained in ACDV are sent to each credit reporting agency with whom the data furnisher has a reporting relationship. *Id*.  The e-OSCAR ACDV process is intended to provide the credit reporting agency with a correction to a consumer's

file that must be handled outside of the regular monthly activity reporting cycle. *Id.* Any data field that requires modification but that cannot be updated via ACDV is updated through the next regular monthly reporting update. *Id.*

## IV.   PLAINTIFF'S RELEVANT STUDENT LOAN HISTORY

According to the National Student Loan Data System ("NSLDS"),[13] Plaintiff borrowed a total of 7 federal student loans under the FDLP to pursue higher education: *See* Plaintiff's NSLDS Aggregate Loan History. Ex. A.   Plaintiff's series of federal student loans, corresponding with disbursement dates, are as follows:

i.       **NSLDS Loans 6-7 (FDLP Stafford Subsidized (6) & Unsubsidized (7))**: In January 2006, Plaintiff borrowed these loans at a variable rate of interest to attend San Diego State University. *See* Ex. A; NSLDS Detail Loans 6-7. Exhibit B; CFDLP Master Promissory Note signed 01/09/2006. Exhibit C.   From January 2006 until July 2006, the loans were serviced by the Direct Loan Servicing Center ("ACS"). *See* Ex. B, at 2, 4.   Loans 6 and 7 were disbursed on 01/13/2006. *Id.* at 1, 3.   In July 2006, Plaintiff paid off these loans in full by way of loan consolidation. *See* Direct Consolidation Loan Record. Exhibit D, 1-2.   The Direct Consolidation loans comprised NSLDS Loans 4 and 5 below.

ii.       **NSLDS Loans 4-5 (FDLP Consolidation Subsidized (5) & Unsubsidized (4))**: In July 2006, these Direct Consolidation loans were originated. *See* Ex. A, 2; Ex. D, 1; NSLDS

---

[13]     The NSLDS is a computer database which includes information on outstanding loans made pursuant to Title IV of the HEA, as well as a large body of loans made and paid off before inception of the NSLDS in 1994.   The NSLDS includes a limited amount of information on loans not held by USDOE, including loans not in repayment status.   All information in NSLDS is derived from regular reports to USDOE from the holders of the loans, including USDOE itself, based on the holder's regularly maintained records on these loans.   Cristin Bulman Declaration. Exhibit O, ¶ 9.

Loans 4-5. Exhibit E, 1, 4. Loans 4 and 5 were disbursed on 07/21/2006. Ex. E, 1, 4.  ACS was the loan servicer until January 2012, at which time these loans transferred to MOHELA for servicing. *See* Ex. E, 3. 6.  DCMS Debt Detail. *Id.* at 3, 6.  MOHELA serviced these loans until February 2018. *Id.*  Due to Plaintiff's default, the loans were assigned to the Debt Management and Collections System ("DMCS")[14] in February 2018. *Id.*  As of March 11, 2019, these loans were paid in full and closed for credit bureau reporting. *See* DMCS Historical Events. Exhibit G, 2. Regarding Plaintiff's major span of delinquency (wherein loans 4 and 5 were reported delinquent between 08/31/2015 and 01/31/2018), the loans were first reported delinquent on August 31, 2015., MOHELA Credit Bureau History. Exhibit J, 10.

**iii.**      **NSLDS Loans 2-3 (FDLP Stafford Subsidized (3) & Unsubsidized (2))**:  In August 2006, Plaintiff borrowed these loans to attend San Diego State University. *See* Ex. A; NSLDS Loans 2-3. Exhibit H, 1, 4.  Loans 2 and 3 were disbursed in two parts, on 1/8/2007 and 08/31/2006. Ex. H, 1, 4.  ACS was the loan servicer from August 2006 until January 2012, at which time these loans transferred to MOHELA. *See* Ex. H, 3, 6.  MOHELA serviced these loans until February 2018. *Id.*  Due to Plaintiff's default, the loans were assigned to DMCS in February 2018. *Id.*  As of March 11, 2019, these loans were paid in full and closed for credit bureau reporting. *See* DMCS Historical Events. Exhibit G, 2.  Regarding Plaintiff's major span of

---

[14]    Defaulted loans are maintained in the Debt Management and Collections System ("DMCS") which is a computer database that contains pertinent information on defaulted student loan accounts held by the Department.  DMCS contains records of payment transactions, collection actions, and telephonic and written contacts between borrowers and USDOE staff or the staff of USDOE's contractors.  These records are created pursuant to USDOE's procedures by USDOE staff and by staff of contractors retained by USDOE to collect these loans in the regular course of their duties at the time of the transaction or event recorded.  The records contained in DMCS are made at or near the time of the transaction recorded, by or from information transmitted by a person with knowledge of the transaction and are kept in the course of USDOE's regularly conducted business of administration of the defaulted loans, pursuant to USDOE's regular practice of making and keeping such records. Cristin Bulman Declaration. Exhibit O, ¶ 10.

delinquency (wherein loans 2 and 3 were reported delinquent between 08/31/2015 and 01/31/2018), the loans were first reported delinquent on August 31, 2015. Ext J, 3, 6.

iv.      **NSLDS Loan 1 (FDLP Graduate PLUS)**:  In November 2006, Plaintiff borrowed this loan to attend San Diego State University. *See* Ex. A; NSLDS Loan 1. Exhibit I, 1.  Loan 1 was disbursed in two parts on 01/04/2007 and 11/02/2006.  Ex. I, 1.  ACS was the loan servicer from November 2006 until January 2012, at which time this loan transferred to MOHELA. *Id*., 3.  MOHELA serviced this loan until December 2017. *Id*., 2.  Due to Plaintiff's default, the loan was assigned to DMCS in December 2017. *Id*.  As of February 6, 2019, this loan was paid in full and closed for credit bureau reporting. *See* Ex. G, 2.  In regard to Plaintiff's major span of delinquency (wherein loan 1 was reported delinquent between 08/31/2015 and 11/30/2017), the loan was first reported delinquent on August 31, 2015. Ex. J, 1.

Regarding these federal student loans, Plaintiff's account was current from March 2012 until July 2015. *See* Ex. J, 1, 3, 6, 10.  Starting in August 2015, Plaintiff's account fell past due and became delinquent, which was reported as such to the national consumer reporting agencies. *Id*.; *see also* MOHELA Past Due Delinquency Notices. Exhibit K.  Plaintiff's account eventually defaulted which resulted in the loans being assigned to DMCS. *See*  MOHELA reported the loans to the credit bureaus one final time as transferred in December 2017 (NSLDS Loan 1) and February 2018 (NSLDS Loans 2-5). *See* Ex. J, 1, 3, 6, 10.  Plaintiff does not appear to contest the reporting of his loans while in default.

On or about May 4, 2021, after it stopped servicing and reporting the loans, MOHELA received Plaintiff's dispute from Equifax via ACDV.  *See* DMCS Debt Detail. Exhibit F, 1-5 (showing dates of default); MOHELA System Printout, Exhibit L, .  The dispute code received was 106 which translates to borrower "disputes present/previous account status/payment

rating/account history." *Id*.  MOHELA also received notice from Plaintiff on or about April 27, 2021 via a dispute letter dated April 8, 2021.  In this letter, Plaintiff disputed the accuracy of MOHELA's reporting of its tradelines as "over 120 days past due" noted under account status in each of the four tradelines. *See* Plaintiff Credit Dispute Letter, Exhibit M.  The nature of the dispute as claimed by Plaintiff in this letter was that the loans were paid in full, and therefore, the information reported was misleading and harming his credit. *Id*.

In a letter dated April 28, 2021, MOHELA responded to Plaintiff stating it completed an investigation of his credit dispute. *See* MOHELA Credit Dispute Response, Exhibit N. MOHELA found no error in its reporting of Plaintiff's student loans. *Id*.  MOHELA explained that the negative information was accurately reported because no forbearance or deferment was requested by Plaintiff to cure the delinquency at the time. *Id*.  MOHELA further provided a breakdown of the periods in which Plaintiff's account was past due and delinquent. *Id*.  MOHELA advised Plaintiff that it "cannot remove information correctly reported…." *Id*. at 1-2.

## STANDARD OF REVIEW

### A.     *Federal Rule of Civil Procedure 12(b)(1) – Subject Matter Jurisdiction*

Under Rule 12(b)(1) of the Federal Rules of Civil Procedure, the Court may dismiss a complaint based on lack of subject matter jurisdiction.  "Federal courts are courts of limited jurisdiction; they are empowered to hear only those cases authorized and defined in the Constitution which have been entrusted to them under a jurisdictional grant by Congress." *Brave Law Firm, LLC v. Truck Accident Lawyers Grp., Inc.*, No. 17-1156, 2019 WL 2073872, at *3 (D. Kan. May 10, 2019) (quotation omitted).  Indeed, "[t]here is a presumption against subject matter jurisdiction" and "[o]nce jurisdiction is challenged, the burden is on the party claiming jurisdiction

to show it by a preponderance of the evidence." *Cicco v. Nat'l Aeronautics & Space Admin.*, No. 18-1164, 2019 WL 1670759, at *1 (D. Kan. Apr. 17, 2019) (citations and quotations omitted).

B. **Federal Rule of Civil Procedure 12(b)(6) – Failure to State a Claim**

"When considering a motion to dismiss, 'all well-pleaded facts, as distinguished from conclusory allegations, must be taken as true' and all reasonable inferences must be afforded to the plaintiff." *Funk v. Pinnacle Health Facilities XXXII, LP*, No. 17-1099-JTM, 2017 WL 3492312, at *2 (D. Kan. Aug. 15, 2017) (quotation omitted). But unlike the factual allegations contained in a complaint, the Court need not accept the plaintiff's legal conclusions as true. *See, e.g., Brooks v. Sauceda*, 85 F. Supp. 2d 1115, 1119 (D. Kan. 2000).

> To survive a motion to dismiss, a complaint must contain factual allegations that "raise a right to relief above a speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). This requires the pleading of "only enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. Thus, the complaint must contain allegations that create a claim for relief not just speculatively but plausibly. *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008).

*Woodward v. DCCA, Inc.*, No. 09-1410-JTM, 2011 WL 42879, at *2 (D. Kan. Jan. 6, 2011). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Under this standard, "the complaint must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." *Harter v. United States*, 344 F. Supp. 3d 1269, 1275 (D. Kan. 2018) (quotation omitted).

## ARGUMENTS & AUTHORITIES

The United States has not waived sovereign immunity from private civil suits brought under §§ 1681n and 1681o of FCRA. Therefore, the State Court lacked subject matter jurisdiction. Upon removal pursuant to 28 U.S.C. § 1442(a), this Court acquires the subject matter jurisdiction

of the State Court from which the action was removed.  Because the State Court did not possess subject matter jurisdiction over Plaintiff's claims, neither does this Court, and the case should be dismissed under Fed. R. Civ. P. 12(b)(1).

Alternatively, the Court should dismiss Plaintiff's claims against USDOE under Fed. R. Civ. P. 12(b)(6) for failure to state a claim because: (1) Plaintiff has failed to plead facts sufficient to support his claims; (2) even assuming Plaintiff's State Court Petition satisfies the pleading requirements, MOHELA's furnishing of Plaintiff's credit information, on the Department's behalf, was accurate, thus barring any claim under the FCRA; and (3) Plaintiff failed to plead any cause of action for "willful" violation of the FCRA.

## I.      PLAINTIFF'S CLAIMS SHOULD BE DIMISSED PURSUANT TO FED. R. CIV. P. 12(b)(1) BECAUSE THE UNITED STATES IS IMMUNE FROM SUITS BROUGHT UNDER §§ 1681n AND 1681o OF THE FCRA

The Court should dismiss Plaintiff's claims against USDOE because USDOE has sovereign immunity from suits under §§ 1681n and 1681o of the FCRA.  "We start with a common rule, with which we presume congressional familiarity, that any waiver of the National Government's sovereign immunity must be unequivocal." *U.S. Dept. of Energy v. Ohio*, 503 U.S. 607, 615 (1992) (citations omitted).  A waiver of sovereign immunity "must be unequivocally expressed in statutory text . . . and will not be implied." *Lane v. Pena*, 518 U.S. 187, 192 (1996) (citations omitted).

"It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction." *United States v. Mitchell*, 463 U.S. 206, 212 (1983); *Wopsock v. Natchees,* 279 Fed. Appx. 679, 685 (10th Cir. 2008).  "A waiver of sovereign immunity 'cannot be implied but must be unequivocally expressed.'" *United States v. Mitchell*, 445 U.S. 535, 538 (1980) (quoting *United States v. King*, 395 U.S. 1, 4 (1969)).  "Moreover, a

waiver of the Government's sovereign immunity will be strictly construed, in terms of its scope, in favor of the sovereign." *Pena,* 518 U.S. at 192 "Any ambiguities in the statutory language are to be construed in favor of immunity . . . so that the Government's consent to be sued is never enlarged beyond what a fair reading of the text requires." *FAA v. Cooper*, 566 U.S. 284, 290 (2012) (citations omitted). "Ambiguity exists if there is a plausible interpretation of the statute that would not authorize money damages against the Government.". *Id*. at 290-291.   "Were the Federal Government to be stripped of sovereign immunity without consent, private suits for money damages would place unwarranted strain on the Government's ability to govern in accordance with the will of its citizens." *Robinson v. Dep't of Educ.*, 140 S. Ct. 1440, 1441 (2020) (Thomas, J. dissenting) (quotations and alterations omitted).   "[A]s the Framers recognized, the allocation of resources must be left to the will of the people." *Robinson v. United States Dep't of Educ.*, 917 F.3d 799, 801 (4th Cir. 2019), *cert. denied sub nom. Robinson v. Dep't of Educ.*, 140 S. Ct. 1440 (2020).

The Supreme Court, Tenth Circuit, and the District of Kansas have not addressed whether the FCRA contains a waiver of sovereign immunity.   More so, there is a widening circuit court split on the issue.   *Compare Robinson*, 917 F.3d at 801 (finding that the FCRA did not unambiguously and unequivocally waive USDOE's sovereign immunity because it is not clear from statutory text  that Congress intended the definition of "person" in the relevant FCRA sections to include the United States or the federal government); *Daniel v. Natl. Park Serv.*, 891 F.3d 762, 776 (9th Cir. 2018) ("Taken together, the legislative history demonstrates that Congress never considered extending the enforcement provisions of FCRA to the federal government. … Congress 'legislate[d] on a sensitive topic inadvertently or without due deliberation' when it used 'person.' *Sossamon v. Texas*, 563 U.S. 277, 290–91 (2011).   The explicit waiver rule exists to prevent such

inadvertent drafting from exposing the United States to liability. *Id.*"), *with Mowrer v. U.S. Dept. of Transportation*, 14 F.4th 723, 730 (D.C. Cir. 2021) (holding that the FCRA waives federal sovereign immunity from its damages claims); *Bormes v. United States*, 759 F.3d 793, 797 (7th Cir. 2014) (same), *but cf. Meyers v. Oneida Tribe of Indians of Wisconsin*, 836 F.3d 818, 827 (7th Cir. 2016) (upholding tribal sovereign immunity under FCRA).

As detailed below, the majority of courts deciding the issue have properly held that sovereign immunity bars FCRA claims against the United States.  For the same compelling reasons considered and found by the majority of district courts as well as the Fourth and Ninth Circuit Courts, this Court should likewise uphold the United States' sovereign's immunity.

### A. FCRA's Civil Damages Provisions Do Not Contain the "Unequivocal" Waiver of Sovereign Immunity Necessary to Subject the United States to Damages actions

To begin, the counter argument necessarily asserted by Plaintiff in this action, is readily surmised: because Congress defined "person" in the original 1970 Act to include any "government or governmental subdivision or agency," 1970 Act § 603(b), 84 Stat. 1128 (15 U.S.C. 1681a(b)), the 1996 provisions of FCRA imposing liability on "person[s]" also impose liability on the United States.  Yet nothing in the text or statutory history of Section 1681n, Section 1681o, or the other FCRA provisions at issue here contains an unambiguous and unequivocally expressed waiver of sovereign immunity.

#### i. There is a presumption that "person" does not include the sovereign

Treating the United States as a "person" across FCRA's enforcement provisions would require this Court to "depart from the often-expressed understanding that 'in common usage, the term person does not include the sovereign, and statutes employing the word are ordinarily construed to exclude it.'" *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 64 (1989) (quoting

*Wilson v. Omaha Tribe*, 442 U.S. 653, 667 (1979)) (some quotations and alterations omitted).  This Court should "follow the Supreme Court's lead in being 'especially reluctant to read "person" to mean the sovereign where, as here, such a reading is decidedly awkward.'"  *Robinson*, 917 F.3d at 804 (quoting *Int'l Primate Prot. League v. Adm'rs of Tulane Educ. Fund*, 500 U.S. 72, 83 (1991).

> **ii.**     ***A holistic reading of FCRA clarifies the ambiguity that Congress did not intend for FCRA's enforcement provisions against "person[s]" to include the United States***

>> a.     <u>The legislative history of FCRA is consistent with USDOE's interpretation</u>

FCRA, as originally enacted, principally regulated "consumer reporting agenc[ies]": entities that aggregate and disseminate personal information about consumers for use by third parties.  1970 Act § 603(f), 84 Stat. 1129; *see* §§ 604-605, 607-614, 84 Stat. 1129-1133.  Consistent with that focus, the civil liability provisions applied only to "consumer reporting agenc[ies]" and "user[s] of information"—not to "person[s]."  §§ 616-617, 84 Stat. 1134.  As expressed by one district court on this issue, "… no agency of the federal government was acting as a consumer-reporting agency in 1970, and thus no federal agency could have been held liable under the FCRA at the time that the FCRA was enacted.  It is understandable, then, why Congress did not think to include within the FCRA a provision explicitly preserving sovereign immunity; if Congress even thought about the question, it likely concluded that such a provision was unnecessary." *Stellick v. U.S. Dept. of Educ.*, Case No. 11-CV-0730 PJS/JJG, 2013 WL 673856, at *3 (D. Minn. Feb. 25, 2013) ("The NSLDS was established in 1986, and did not take on its current role until 1989, nearly two decades after FCRA was passed. *See* Pub.L. No. 99–498, § 407(a), 100 Stat. 1268, 1486 (1986); Pub.L. No. 101–239, § 2008, 103 Stat. 2106, 2121 (1989)." *Id.* at *3 & n.2).

Although the 1996 Act expands the FCRA's scope from consumer reporting agencies to include "persons" who provide information to reporting agencies and who make use of credit

reports, *e.g.*, 15 U.S.C. §§ 1681b(b)(2)-(3) and 1681m(a), its expanded remedial provisions do not contain any language expressing an "unequivocal" waiver of federal sovereign immunity.

Moreover, nothing in the FCRA's legislative history suggests that Congress believed it was imposing vast new liabilities on the United States and other governments. *See Employees of the Department of Public Health & Welfare v. Department of Public Health & Welfare*, 411 U.S. 279, 285 (1973) (finding no waiver of state sovereign immunity because "we have found not a word in the history of the 1966 amendments to indicate" that Congress wished to waive such immunity). The House Report on an early version of the 1996 Act observed only that extension of the liability provisions to "'any person who'" fails to comply with FCRA would bring within the scope of the provisions "persons who furnish information to consumer reporting agencies, such as banks and retailers." H.R. Rep. No. 486, 103d Cong., 2d Sess. 49 (1994); *see* S. Rep. No. 185, 104th Cong., 1st Sess. 48-49 (1995). Likewise, the sponsor of a Senate bill containing identical language described those provisions as extending liability to "banks, retailers, and other creditors." 140 Cong. Rec. 8941 (1994) (statement of Sen. Bryan).

As the Ninth Circuit observed, "[t]he lack of any reference to potential federal liability is particularly glaring given the federal government's role as the nation's largest employer, lender, and creditor, and its corresponding vulnerability to suit under the new FCRA provisions." *Daniel*, 891 F.3d at 776. The 1996 Act broadened FCRA to regulate the conduct of "persons" in various respects that, under a mechanical reading, would make the federal government a ubiquitous FCRA defendant. *Id*. at 775-776 (brackets omitted).

Any argument that the consequence of stripping the government's immunity would have little consequence is misplaced. Treating the United States as a "person" across FCRA's enforcement provisions opens the government to damages actions ranging from the routine

printing of credit card receipts, *e.g., Daniel*, 891 F.3d at 765, to practices related to its extensive employment and lending activities.  As the Fourth Circuit recognized, "[t]here is no telling the true costs of a waiver." *Robinson*, 917 F.3d at 804 (4th Cir. 2019).  Justice Thomas expresses a similar concern, dissenting from the denial of certiorari in *Robinson*:

> These ramifications are magnified here because the Federal Government's potential liability under the FCRA is substantial. As the Nation's primary student-loan lender, it is one of the largest furnishers of credit information in the country. According to petitioner, the Federal Government is responsible for 90 percent of student loans nationwide in a market that has tripled between 2007 and 2018, from $500 billion to a staggering $1.5 trillion. Pet. for Cert. 39. A waiver of sovereign immunity would thus have a significant impact on the public fisc.

*Cert. Denied, Robinson v. Dept. of Educ.*, 140 S. Ct. 1440, 1441–42 (2020) (Thomas J., dissenting).

Put plainly, FCRA as enacted in 1970 did not waive the sovereign immunity of the United States.  And nothing in the 1996 Act suggests that the expanded provisions are intended to apply to the United States.  When examining the 1970 Act and 1996 Act together, the combination cannot be read to impliedly create such a waiver. *See Lane*, 518 U.S. at 192.  With no legislative history to support a waiver of sovereign immunity, and a vast expansion of the federal government's liability in the balance, the Court should refrain from interpreting the existence of a waiver.

        b.      <u>Seemingly clear statutory language may be ambiguous when it creates numerous issues in its statutory scheme</u>

The mechanical reading of the FCRA requiring every instance of "person" to refer to the United States disregards the fundamental principal that "[s]tatutory construction is a 'holistic endeavor,'" *Koons Buick Pontiac GMC, Inc. v. Nigh*, 543 U.S. 50, 60 (2004) (citation omitted), and thus "look[s] to the provisions of the whole law," and not merely "a single sentence" of the statute, *Star Athletica, L.L.C. v. Varsity Brands, Inc.*, ___ U.S. ___, 137 S. Ct. 1002, 1010 (2017) (citations omitted).  "In settling on a fair reading of a statute, it is not unusual to consider the

ordinary meaning of a defined term, particularly when there is dissonance between that ordinary meaning and the reach of the definition." *Bond v. United States*, 572 U.S. 844, 861 (2014).

Utilizing statutory construction as a holistic endeavor, two recent, noteworthy cases found statutory language ambiguous that, at first glance, would seem clear in their natural sense.  In *King v. Burwell*, 576 U.S. 473 (2015) the Supreme Court was asked whether a Federal Exchange is "an Exchange established by the State" under a provision of the Affordable Care Act (26 U.S.C. § 36B) when the Act defines "State" to mean "each of the 50 States and the District of Columbia"— a definition that does not include the federal government. 42 U.S.C. § 18024(d).  Noting the repeated issues arising in the statutory scheme when the phrase "Exchange established by the State" is given its most natural meaning, the Court found the apparently straightforward language ambiguous when read in context.  Thus, the Court looked "to the broader structure of the Act to determine whether one of Section 36B's 'permissible meanings produces a substantive effect that is compatible with the rest of the law.'"  *King*, 576 U.S. at 475 (2015) (quoting *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 371 (1988)).  Likewise, the Supreme Court's analysis of the Clean Air Act's use of "air pollutant" is instructive in *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 319-20 (2014):

> To be sure, Congress's profligate use of "air pollutant" where what is meant is obviously narrower than the Act-wide definition is not conducive to clarity. One ordinarily assumes " 'that identical words used in different parts of the same act are intended to have the same meaning.' " *Environmental Defense v. Duke Energy Corp.,* 549 U.S. 561, 574, 127 S.Ct. 1423, 167 L.Ed.2d 295 (2007). In this respect (as in countless others), the Act is far from a *chef d'oeuvre* of legislative draftsmanship. But we, and EPA, must do our best, bearing in mind the " 'fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.' " *FDA v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 133, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000). As we reiterated the same day we decided *Massachusetts,* the presumption of consistent usage " 'readily yields' " to context, and a statutory term—even one defined in the statute—"may take on

distinct characters from association with distinct statutory objects calling for different implementation strategies." *Duke Energy, supra,* at 574, 127 S.Ct. 1423.

*Util. Air Reg. Group*, 573 U.S. at 319–20.  In the instant case, like in *King* and *Util. Air Reg. Group*, a mechanical reading of FCRA requiring "person" to include governments for the purposes of FCRA enforcement measures must give way to the broader statutory scheme.

> c.   Without clear Congressional intent, the Court should reject interpreting the 1996 Act as expanding enforcement measures against governments

*Employees*, 411 U.S. 279 illustrates the Supreme Court's general refusal to interpret amendments to an existing statutory scheme as allowing new damages actions against the sovereign when neither the text nor history of the amendments affirmatively demonstrates that Congress intended that result.[15]  *Employees* concerned an amendment to the Fair Labor Standards Act of 1938 (FLSA), 29 U.S.C. 201 *et seq*., that expanded the statutory definition of "employer" to include state hospitals.  *See* 411 U.S. at 282-283.  The FLSA already provided for civil remedies, including back pay and liquidated damages, against "[a]ny employer who violates the" FLSA's minimum-wage and overtime provisions. *Id*. at 283 (citation omitted).  Yet the Court held that the amendment's expansion of the term "employer" to include state hospitals did not expose the States who ran those hospitals to damages liability otherwise applicable to an "employer." *See id*. at 284-286.  In *Employees*, the Supreme Court stated that Congress could "place new or even enormous fiscal burdens on the States." *Id*. at 284.  But under the unequivocal waiver rule, the Court found

---

[15]   The Supreme Court has long refused to read statutes to have waived the sovereign immunity of the United States absent a clear and unambiguous statement, even when the statute could reasonably be read to the contrary. *E.g., United States v. Idaho ex rel. Director, Idaho Department of Water Resources*, 508 U.S. 1, 7 (1993); *Library of Congress v. Shaw*, 478 U.S. 310, 323 (1986) (*superseded by statute* on other grounds); *Employees of the Department of Public Health & Welfare v. Department of Public Health & Welfare,* 411 U.S. 279 (1973); *United States v. Chemical Foundation, Inc.*, 272 U.S. 1, 20-21 (1926).

the FLSA amendments wanting: "[W]e have found not a word in the history of the 1966 amendments to indicate a purpose of Congress to make it possible … to sue the State," and therefore "[i]t is not easy to infer that Congress … desired silently to deprive the States of an immunity they have long enjoyed under … the Constitution." *Id.* at 285.

In *Employees*, Congress expanded a statutory definition of "employer" without amending the substantive liability provisions applicable to "any employer."  Here, Congress expanded FCRA's liability provisions to reach "any person" without amending the statutory definition of "person."  Yet in neither case did Congress include affirmative language unequivocally waiving sovereign immunity.  As with the FLSA amendment in *Employees*, the 1996 Act should not be read to expose the United States to liability, even assuming that the "literal language" of the definitional provision might be read to impose such liability. *Employees*, 411 U.S. at 283.

### iii.       Defining "person" to Include the United States Creates Implausible Results

To otherwise find in favor of the simplistic reading of FCRA and impose liability— including criminal liability, imprisonment, and punitive damages—on the United States under FCRA creates a deluge of "implausible" results that make "little sense." *Daniel v. Natl. Park Serv.*, 891 F.3d 762, 770-71 (9th Cir. 2018); *see also, Robinson*, 917 F.3d at 804.

Of foremost importance, treating the United States as a "person" across FCRA's enforcement provisions would subject the United States to criminal penalties, including incarceration.  "Any person who knowingly and willfully obtains information on a consumer from a consumer reporting agency under false pretenses shall be fined under Title 18, imprisoned for not more than 2 years, or both." 15 U.S.C. § 1681q.  "Imagine a court's puzzlement upon seeing a criminal case captioned '*United States v. United States*.' *See Cooper Corp.*, 312 U.S. at 609, 61 S.Ct. 742 ('It must be obvious that the United States cannot be embraced by the phrase "any

person'" when a statute criminalizes conduct by 'any person.' *Id.*)." *Robinson*, 917 F.3d at 804; *see also United States v. I.C.C.*, 337 U.S. 426, 430 (1949) ("There is much argument with citation of many cases to establish the long-recognized general principle that no person may sue himself. Properly understood the general principle is sound, for courts only adjudicate justiciable controversies. They do not engage in the academic pastime of rendering judgments in favor of persons against themselves."); *United States v. I.C.C.*, 337 U.S. 426, 430 (1949); *Globe & Rutgers Fire Ins. Co. v. Hines*, 273 F. 774, 777 (2d Cir. 1921) ("It is elementary that the same person cannot be both plaintiff and defendant at the same time in the same action.").

The statute allows for the "prosecution of 'any government,' not *the employees* of any government.  The pro-waiver camp cannot have it both ways—literal most often, just not when it suits to blur the lines." *Id.* at 805; *see United States v. Cooper Corp.*, 312 U.S. 600, 609 (1941) (explaining that "person" in the antitrust laws must exclude the United States because it would subject the federal government to criminal liability); *cf. Return Mail, Inc. v. United States Postal Service*, 139 S. Ct. 1853, 1863 & n.4 (2019) (observing that a provision relieving the Patent Office of certain confidentiality obligations when " 'a person' " is charged "with a criminal offense" is an example of a use of "person" that "plainly excludes the Government") (citation omitted).

Additionally, treating the United States as a "person" across FCRA's enforcement provisions would expose the United States to enforcement actions brought by its own agencies, such as the Federal Trade Commission, as well as state governments.  Under 15 U.S.C. § 1681s(a)(2)(A) of FCRA, "the Federal Trade Commission may commence a civil action to recover a civil penalty in a district court of the United States against any *person* that violates this title [15 U.S.C. § 1681 *et seq.*]" (emphasis added).  Likewise, 15 U.S.C. § 1681s(b)(1)(H) provides for enforcement by the Consumer Finance Protection Bureau.  "If the prospect of the CFPB pursuing

a civil action against the United States is any less odd than a criminal prosecution of the United States, it is not by much.  To make matters worse, states also play a role in enforcing FCRA's various provisions. *See* 15 U.S.C. § 1681s(c).  It would be anomalous for the United States to expose its fisc to the suits of state attorneys general in such an offhanded manner." *Robinson*, 917 F.3d at 805.  And, it is impossible to imagine that Congress intended federal agencies to sue one another—or the United States itself—in federal court to recover civil penalties under FCRA. Congress *Cf.   Lindsey, et al. v. Lessee of Miller,* 31 U.S. 666, 669 (1832) (Congress is presumed to know and understand the law, both legally and factually); Joseph W. Mead, *Interagency Litigation and Article III*, 47 Ga. L. Rev. 1217, 1245 (2013).

Moreover, treating the United States as a "person" across FCRA's enforcement provisions would expose the United States to punitive damages for willful noncompliance under § 1681n of FCRA.  This notion invades yet another presumption, "a presumption against imposition of punitive damages on governmental entities." *Daniel*, 891 F.3d at 771. (quoting *Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 785 (2000)).  And given this presumption, Congress must be more "explicit in licensing punitive damages against the sovereign . . . ." *Id.*

In fact, if the FCRA's definition of "person" is to be taken in its mechanical sense, it follows that "any government" is then subject to liability, which must include foreign, tribal, and state governments.  The implications of such a reading are extreme.  As the Fourth Circuit described, the implication as to foreign governments "would require courts to compromise treaties and to undermine principles of international comity." *Robinson.*, 917 F.3d at 805 (citing *Samantar v. Yousuf*, 560 U.S. 305, 311-25, 130 S.Ct. 2278, 176 L.Ed.2d 1047 (2010) (describing common-law and statutory immunities afforded to foreign governments)).  The implications as to tribal government would be "to cast aside a history of tribal immunity." *Id*. citing *Bay Mills Indian Cmty.*,

572 U.S. at 788-91, 134 S.Ct. 2024 (discussing tribal sovereign immunity).   As to state governments, such a reading would "ignore constitutional limits on federal abrogation of state sovereign immunity. *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 47, 72, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) (holding that Congress lacks the power to abrogate state sovereign immunity under the Commerce Clause)."[16] *Id.*  It would be both remarkable and constitutionally troublesome to assume that Congress intended to allow States to seek damages under the FCRA against the United States, *cf. McCulloch v. Maryland*, 17 U.S. 316, 431 (1819), or against another State and its agencies, *cf. Franchise Tax Board v. Hyatt*, 139 S. Ct. 1485, 1499 (2019).

Thus, at the very least, these outcomes highlight an ambiguity in the word "person" that weighs in favor of upholding the presumption of sovereign immunity. *See Cooper*, 566 U.S. at 290 ("Ambiguity exists if there is a plausible interpretation of the statute that would not authorize money damages against the Government.").

### iv.      Defining "person" to enforce FCRA against the United States creates internal inconsistencies

Congress has demonstrated that when it wants to allow damages actions against the United States under FCRA, it does so expressly.  Plaintiff's reading of §§ 1681n and 1681o of FCRA is inconsistent with other sections of the statute in which sovereign immunity is waived.  Unlike §§ 1681n and 1681o, Congress explicitly waived sovereign immunity under § 1681u(j) of FCRA, which concerns disclosures of credit information to the FBI for counterintelligence purposes:

---

[16]      As the Fourth Circuit Court of Appeals recognized in *Robinson*, 917 F.3d at 805 (4th Cir. 2019), Congress presumably enacted the 1996 FCRA Amendment while mindful of the Supreme Court's decision in *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44 (1996), issued only months earlier, which held that Congress lacked authority under the Commerce Clause to abrogate state sovereign immunity to private damages actions. *See id*. at 47, 72.  As the Fourth Circuit explains in *Robinson*, it is implausible that Congress, "in an insurrectionary moment," responded to *Seminole Tribe* with an attempt to subject States to both compensatory and punitive damages under FCRA.

> *Any agency or department of the United States* obtaining or disclosing any consumer reports, records, or information contained therein in violation of this section is liable to the consumer to whom such consumer reports, records, or information relate in an amount equal to the sum of -- (1) $100, without regard to the volume of consumer reports, records, or information involved; (2) any actual damages sustained by the consumer as a result of the disclosure; (3) if the violation is found to have been willful or intentional, such punitive damages as a court may allow; and (4) in the case of any successful action to enforce liability under this subsection, the costs of the action, together with reasonable attorney fees, as determined by the court.

15 U.S.C. § 1681u(j) (emphasis added).   Congress's unequivocal waiver of federal sovereign immunity in Section 1681u(j) of the FCRA is a strong indication that it intended no waiver in Sections 1681n and 1681o.  The waiver of sovereign immunity under § 1681u(j) is "plain as day." *Robinson*, 917 F.3d at 804.  If Congress wanted to waive sovereign immunity under §§ 1681n and 1681o of FCRA—from which Plaintiff's claims arise—"it could have used that same language" as set forth above in § 1681u(j). *See Robinson*, 917 F.3d at 804; *Daniel*, 891 F.3d at 772.

a. <u>Congress acts clearly when it desires to waive sovereign immunity</u>

Another example of a "plain-as-day" waiver is the Tucker Act and the so-called "Little Tucker Act."   Under the Tucker Act, "[t]he United States Court of Federal Claims shall have jurisdiction to render judgment upon *any claim against the United States* . . . ." 28 U.S.C. § 1491(a)(1) (emphasis added).  Similarly, under the Little Tucker Act, "[t]he district courts shall have original jurisdiction, concurrent with the United States Court of Federal Claims, of . . . [a]ny other civil action or claim against the United States . . . ." 28 U.S.C. § 1346(a)(2)  The same holds true of the Federal Torts Claims Act: "The United States [is] liable ... in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674.  As pointed out by the Fourth Circuit, "the words 'United States' appear in a great many waivers. *E.g.*, 12 U.S.C. § 3417(a) ('Any agency or department of the United States ... is liable to the customer ....');

42 U.S.C. § 9620(a)(1) ('Each department, agency, and instrumentality of the United States ... shall be subject to ... liability under section 9607.'); s*ee also* 26 U.S.C. § 7433(a) (waiver describing 'United States'); 46 U.S.C. § 30903(a) (same)." *Robinson*, 917 F.3d at 803.

Each of these statutes indicates in plain language that Congress knows how to waive sovereign immunity when it wants to—by stating that the "United States" is subject to liability. "Although Congress need not use 'magic words' to waive sovereign immunity, most other waivers of sovereign immunity specifically mention the 'United States.'" *Daniel*, 891 F.3d at 772 (citation omitted). The fact that Congress chose not to do so under §§ 1681n and 1681o of the FCRA means that the United States has not waived sovereign immunity for Plaintiff's claims.

> **v.       Reading the FCRA without waiver of sovereign immunity does not render the inclusion of "government or governmental subdivisions or agency" in the definition of "person" superfluous**

Reading the FCRA as preserving sovereign immunity, the inclusion of "government or governmental subdivisions or agency" in the definition of "person" in 15 U.S.C. § 1681a(b) is not superfluous. This inclusion renders the substantive duties of a consumer reporting agency with respect to a "person" equally applicable with respect to a government or governmental subdivision or agency. *See, e.g.*, 15 U.S.C. § 1681b (describing various circumstances under which a consumer reporting agency may furnish a consumer report to a "person"); 15 U.S.C. § 1681c-1(i)(4) (describing exceptions to the requirement to place a security freeze on the making of a consumer report if the request is by a "person" for certain enumerated uses). As the Fourth Circuit stated in *Robinson*, FCRA's substantive requirements that apply to "persons" also could be read as applying to governmental bodies. *Robinson*, 917 F.3d at 806. And, as the court recognized, "substantive and enforcement provisions in the FCRA are not one and the same" while the issues discussed "relate to the statute's enforcement provisions." *Id*.

At a minimum, reading FCRA to exclude the United States (and other governments) from the civil liability provisions "is a plausible interpretation of the statute" and therefore must be adopted in this context. *FAA v. Cooper*, 566 U.S. 284, 290 (2012).

> ### vi. It is unlikely that Congress intended the FCRA to discompose the carefully calibrated remedies available against the federal government under the Privacy Act of 1974, 5 U.S.C. § 552a

Another reason to doubt Plaintiff's reading of the FCRA is that Congress is unlikely to have intended the 1996 Act to disrupt the carefully calibrated remedies available against the United States under the Privacy Act of 1974, 5 U.S.C. § 552a. That statute comprehensively regulates Executive Branch agencies in their collection, maintenance, use, and dissemination of "records" containing information about an "individual," when those records are maintained as part of a "system of records." 5 U.S.C. §§ 552a(a)(1)-(5) and (b). The Privacy Act authorizes a limited class of private civil actions to enforce its terms. 5 U.S.C. § 552a(g); *see Cooper*, 566 U.S. at 303 (observing that Congress's intent in enacting the Privacy Act was "to cabin relief, not to maximize it").

Plaintiff's reading of FCRA would vastly expand the liability of the United States for federal agency activity already covered by the Privacy Act. The Privacy Act, for example, addresses disclosures by a federal agency to a consumer reporting agency of an overdue debt that the federal agency is trying to collect—a type of disclosure that a federal agency is required by law to make under certain circumstances, *see* 31 U.S.C. § 3711(e), including with respect to student loans, *see* 20 U.S.C. §§ 1080a, 1087a(b)(2). If the disclosed record of the overdue debt contains an error, the Privacy Act offers procedures whereby the individual to whom the record pertains can correct the record, *see* 5 U.S.C. § 552a(d), and requires the federal agency to inform the consumer reporting agency about any correction, *see* 5 U.S.C. § 552a(c)(4).

Yet under the Privacy Act, an individual generally may seek only injunctive relief, not money damages, for failure to correct the record. 5 U.S.C. §§ 552a(g)(1)(A) and (2)(A). Compensatory damages are available only if "actual damages" resulted from an "intentional or willful" failure to take specified actions. 5 U.S.C. § 552a(g)(4)(A); *see Doe v. Chao*, 540 U.S. 614, 620-621 (2004). By contrast, Plaintiff's reading of the FCRA would permit a damages action for a failure to correct the record. 15 U.S.C. §§ 1681n, 1681o, and 1681s-2(b). And it would permit either type of action to be premised merely on negligence, without any need to prove intentional or willful conduct. 15 U.S.C. § 1681o. It also would permit, in the case of a willful violation, automatic statutory damages without any showing that the plaintiff sustained "actual damages." 15 U.S.C. § 1681n(a)(1)(A). Congress cannot have intended the Privacy Act's reticulated remedial scheme to be so easily displaced or circumvented.

**B.     The Overwhelming Majority of Courts Encountering the Issue are Preserving the United States' Sovereign Immunity**

Consistent with the principles of statutory interpretation discussed herein, a great majority and growing number of courts hold that the United States is immune from suits under §§ 1681n and 1681o of the FCRA. The district courts have overwhelmingly found no waiver of sovereign immunity on the present issue. In *Washington v. United States Dept. of Ed.*, 2021 WL 2593617, at *5 (M.D. Ga. June 24, 2021) the district court agreed with the "reasoning of the Ninth Circuit in *Daniel* and the Fourth Circuit in *Robinson"* that "Congress did not clearly and unequivocally waive sovereign immunity in the FCRA" and decided with "the overwhelming majority of district court cases that have faced this issue in the last two years." Collecting cases,[17] the *Washington*

---

[17]     *Thorpe*, 2021 WL 1997030; *Gray v. Equifax Info. Sys, LLC*, 519 F. Supp. 3d 1138, (S.D. Fla. 2021); *Black v. Equifax Info. Services*, LLC, 2021 WL 1246118 (N.D. Ga. Feb. 22, 2021), report and recommendation adopted, 2021 WL 1246117 (N.D. Ga. Mar. 23, 2021); *Marzouq v. U.S. Dep't of Educ.*, 2019 WL 2996177 (E.D. Mich. July 9, 2019); *Thurston v. Equifax*

court notes that "[n]early every district court that has faced this issue since the Fourth Circuit decided Robinson in 2019 has found that Congress did not clearly waive sovereign immunity in the FCRA." [18] *Id.* at *5, n.8 "The Court is aware of only one case in the same period that did not

*Info. Services, LLC*, 2020 WL 6434854 (W.D. Tex. Nov. 2, 2020); *Golden v. Hood*, 2020 WL 7321072 (W.D. Ark. Dec. 11, 2020); *Johnson v. Trans Union, LLC*, 2019 WL 3202212 (W.D. La. July 15, 2019); *Tillery v. U.S. Dep't of Educ.*, 2019 WL 3413518 (D. Md. July 29, 2019); *Smith v. Penn. Higher Educ. Assistance Agency*, 2019 WL 3219896 (E.D. Mich. July 17, 2019); *Scott v. Synchrony Bank*, —— F. Supp. 3d ——, 2021 WL 2021575 (W.D. N.Y. May 21, 2021); *Stein v. U.S. Dep't of Educ.*, 450 F. Supp. 3d 273 (E.D. N.Y. 2020); *Kirtz v. Trans Union, LLC*, 2021 WL 1750141 (E.D. Penn. May 4, 2021); *Ainsworth v. U.S. Dep't of Educ.*, 2019 WL 6134482 (N.D. Okla. Nov. 19, 2019); *Coleman v. Devos*, 2020 WL 9219408 (N.D. Tex. Dec. 28, 2020).

[18]     Other recent cases not collected by the June 2021 decision in *Washington*, 2021 WL 2593617, include the following favorable decisions to the United States' position: *Edelman v. U.S. Govt.*, 2020 WL 7123175, at *7 (E.D.N.Y. Dec. 4, 2020) ("[B]ecause the FCRA does not contain a clear and unequivocal waiver of the Government's sovereign immunity, this Court is without subject matter jurisdiction to adjudicate Plaintiff's FCRA claims against the Federal Defendants."); *Sanders v. Equifax Info. Services*, LLC, 1:20-CV-3015-AT-JKL, 2021 WL 1246369, at *4 (N.D. Ga. Feb. 22, 2021), *report and recommendation adopted*, 1:20-CV-3015-AT, 2021 WL 1246113 (N.D. Ga. Mar. 12, 2021) ("[T]he substantive and enforcement provisions in [the] FCRA are not one and the same."); *Hope v. Dept. of Health and Human Services*, 2020 WL 2527032, at *5 (W.D.N.C. May 18, 2020) ("[T]he FCRA contains no general waiver of sovereign immunity."); *Williams v. Equifax Info. Services*, 2021 WL 3566635, at *2 (E.D. Mo. Aug. 12, 2021) ("Following the reasoning in both Robinson and Daniel, the Court finds that because the FCRA does not expressly waive sovereign immunity for liability, and is at best ambiguous . . . ."); *Person v. Equifax Info. Services, LLC*, 2021 WL 2874119, at *2 (M.D. Ala. July 8, 2021) ("Because FCRA does not contain such an unambiguous and unequivocal waiver of sovereign immunity with respect to the claims asserted in this case, the court lacks subject matter jurisdiction over the FCRA claims against the DOE."); *Chatman v. Equifax Info. Services, LLC*, 120CV02843LMMLTW, 2021 WL 2472902, at *2 (N.D. Ga. June 4, 2021) ("The undersigned is persuaded by the reasoning of Daniel, Robinson, and all the Courts in this District that have addressed the issue."); *Dumas v. GC Services, L.P.*, 2019 WL 529260, at *4 (E.D. Mich. Feb. 11, 2019) ("Because the FCRA does not expressly waive sovereign immunity for liability, and is at best ambiguous, the Court, following Daniel, will also dismiss Dumas' FCRA claim against the government for lack of subject matter jurisdiction."); *Robinson v. Pennsylvania Higher Educ. Assistance Agency*, GJH-15-0079, 2017 WL 1277429, at *3 (D. Md. Apr. 3, 2017), *aff'd sub nom. Robinson v. U.S. Dept. of Educ.*, 917 F.3d 799 (4th Cir. 2019) ("In this case, the Court also declines to follow the Seventh Circuit's decision in Bourne. The Court starts with the guiding principle that '[i]t is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction.' *United States v. Mitchell*, 463 U.S. 206, 212 (1983)."); *Gillert v. U.S. Dept. of Educ.*, 2010 WL 3582945, at *4 (W.D. Ark. Sept. 7, 2010) ("[T]he FCRA does not contain an unequivocal and express waiver of sovereign immunity."); *Ralph v. U.S. A.F. MGIB*, 2007 WL 3232593, at *3 (D. Colo. Oct. 31,

follow the trend. *Hatch v. Equifax Info. Services, LLC*, 2021 WL 1923419 (E.D. Mich. May 13, 2021)"[19] *Id*.

This brief has made frequent use of the supportive holdings from the Fourth and Ninth Circuit Courts of Appeals in *Robinson*, and *Daniel*. The Fourth Circuit found that there is "strong evidence" in the text and structure of FCRA "that Congress did not waive sovereign immunity under FCRA." *Robinson*, 917 F.3d at 804. And the Ninth Circuit went so far as to find that a waiver of sovereign immunity would lead to "patently absurd" results. *See Daniel*, 891 F.3d at 770 (quotations omitted). In accordance with these decisions, this Court should also hold that USDOE maintains its sovereign immunity.

> i.    ***Robinson and Daniel are more persuasive than Bormes and Mowrer***

The minority legal view adopted by Plaintiff originates from the Seventh Circuit's decision in *Bormes*, where a Seventh Circuit panel held that the Congress waived the United States' sovereign immunity because of the definition of "person" under the FCRA. *See* 759 F.3d 793 at 795 (citing 15 U.S.C. §1681a(b)). The statute defines a person as "any individual, partnership, corporation, trust, estate, cooperative, association, government or governmental subdivision or agency, or other entity." 15 U.S.C. §1681a(b). A similar minority opinion was reached more recently in *Mowrer* when the District of Columbia Circuit, grappling with the Fourth and Ninth

---

2007) ("[T]he United States has not consented to suit under that statute [FCRA]."); *Kenney v. Barnhart*, 2006 WL 2092607, at *9 (C.D. Cal. July 26, 2006) (same).

[19]   Other recent cases in the minority camp not collected by the by the June 2021 decision in *Washington* include *Barclay v. U.S. Dep't of Educ.*, No. 20-cv-02849 (N.D. Ga. Sept. 15, 2021), ECF No. 43; *Hatch v. Equifax Info. Services, LLC*l, 2021 WL 1923419 (E.D. Mich. May 13, 2021); *Murphy, v. Equifax Info. Servs., LLC, et al.*, 2021 WL 5578701 (D.N.J. Nov. 30, 2021).

Circuit opinions, nonetheless found the FCRA "provisions speak clearly enough to waive federal sovereign immunity." *Mowrer v. U.S. Dept. of Transportation*, 14 F.4th 723, 729 (D.C. Cir. 2021).

The *Bormes* and *Mowrer* courts read "any government" to mean "United States" and did not take a "holistic view" of FCRA, considering the structure, text, and plain meaning of the statute. *See Robinson*, 917 F.3d at 806 (notably decided before *Mowrer* but noting the *Bormes* court's failure to take "holistic statutory view" in interpreting "person" and "any government"). While the September 24, 2021 *Mowrer* decision has seen little discussion outside of its circuit, courts across the country have frequently criticized the 2014 *Bormes* decision. *But cf. Murphy, v. Equifax Info. Servs., LLC, et al.*, 2021 WL 5578701, at *5 (D.N.J. Nov. 30, 2021) (relying on *Mowrer*). For example, the Ninth Circuit in *Daniel* characterized the reasoning in Bormes as "not convincing" and achieving a result by going down "a long and twisted path." *Daniel*, 891 F.3d at 773 & n.8. Additionally, several district courts have explicitly rejected the holding and reasoning of *Bormes*, finding it unpersuasive.[20]

### ii.      *The Seventh Circuit has since retreated from Bormes*

When the Seventh Circuit first came to face the ramifications of waiving the United States' sovereign immunity for the FCRA enforcement provision, two years after its decision in *Bormes*, in *Meyers v. Oneida Tribe of Indians of Wisconsin*, 836 F.3d 818 (2016), *cert. denied*, 137 S. Ct.

---

[20]      *See, e.g., Sanders v. Equifax Info. Services*, LLC, 1:20-CV-3015-AT-JKL, 2021 WL 1246369, at *4 (N.D. Ga. Feb. 22, 2021), *report and recommendation adopted,* 1:20-CV-3015-AT, 2021 WL 1246113 (N.D. Ga. Mar. 12, 2021) ("*I also find the reasoning of Bormes unpersuasive.*"); *Gray*, 519 F. Supp. 3d 1138, 1144 ("The Court does not agree with the rationale in *Bormes.*"); *Golden*, 2020 WL 7321072, at *3 (finding *Robinson* and *Daniel* "more persuasive" than *Bormes*); *Dumas*, 2019 WL 529260, at *4 9 ("Having reviewed both decisions, the Court finds the reasoning of <u>Daniel</u> more persuasive" than *Bormes*.); *Johnson*, 2019 WL 3202212 (recognizing that *Daniel* and *Robinson* are more persuasive than *Bormes*); *Stein*, 450 F. Supp. 3d at 277-78 (acknowledging but declining to follow *Bormes*); *Thurston,* 2020 WL 6434854 at *5 (same).

1331 (2017), the Seventh Circuit engaged in the correct holistic analysis to conclude that the FCRA did not waive tribal sovereign immunity. *Id.* at 827.   The *Meyers* court recognized that "if it is Congress's intent to abrogate tribal immunity, it must clearly and unequivocally express that purpose." *Id.* at 824.   And it explained that although the definition of "'person'" in 15 U.S.C. 1681a(b) "includes 'any government,' " which it acknowledged could in isolation be "broad enough to include Indian tribes," 836 F.3d at 824 (ellipsis omitted), that definition was insufficiently clear and unequivocal to waive tribal sovereign immunity, *see id.* at 826-827. "[W]hen it comes to sovereign immunity," the court explained, "Congress' words must fit like a glove in their unequivocality." *Id.* at 827.   *Meyers* distinguished its prior decision in *Bormes* in part by reading the phrase " 'any government' " to include the United States as "entirely natural," whereas the phrase is "equivocal" as to whether it includes tribal governments in light of "the long-held tradition of tribal immunity." *Id.* at 826 (citation omitted).

Although *Meyers* did not purport to overrule *Bormes*, the respective analyses in those two cases are in serious tension.   The sovereign immunity of the United States, especially to suits for money damages, is fundamental under the constitutional structure, and that rule is at least as long recognized as tribal sovereign immunity.   Moreover, there is no textual basis in the FCRA's definition of "person" to treat the word "government" as applying to the federal government (and possibly state governments) but not tribal governments.   Accordingly, it is far from clear that, if squarely presented with the issue, the Seventh Circuit would adhere to its holding in *Bormes*, especially now that two other courts of appeals have expressly disagreed with *Bormes*.

### C.    This Court Lacks Jurisdiction Under the Derivative Jurisdiction Doctrine

This Court lacks jurisdiction over Plaintiff's civil action because a federal court's jurisdiction is derivative of the state court's jurisdiction once removed under 28 U.S.C. § 1442.

The State Court in which Plaintiff filed this suit lacked jurisdiction to hear claims against the federal government brought under the FCRA.[21]   Because there has been no unequivocal waiver of the government's sovereign immunity as to the enforcement provisions of the FCRA, the government was not susceptible to suit for the alleged violations of the FCRA.   "Therefore, the state court lacked subject matter jurisdiction. Upon removal pursuant to 28 U.S.C. § 1442(a), this Court acquired the subject matter jurisdiction of the state court from which the action was removed. Because the state court did not possess subject matter jurisdiction, neither does this Court." *Tice v. U.S. Dept. of Treas.*, 2017 WL 3017717, at *5 (D.S.C. Mar. 30, 2017).

      **D.**      **Plaintiff's Jury Demand Must be Stricken**

In *Lehman v. Nakshian*, 453 U.S. 156  (1981), the Supreme Court found that when Congress waives the Government's immunity from suit, the plaintiff has a right to a trial by jury only where Congress has affirmatively and unambiguously granted that right by statute.  "It has long been settled that the Seventh Amendment right to trial by jury does not apply in actions against the Federal Government." *Id.* at 160.   Even if the Court finds that Congress has unequivocally and unambiguously waived the government's sovereign immunity from private civil suits brought under §§ 1681n and 1681o of FCRA, there is no such argument that Congress has likewise granted the right to trial by jury against the United States under the FCRA.

**II.**      **PLAINTIFF'S CLAIMS SHOULD BE DIMISSED PURSUANT TO FED. R. CIV. P. 12(b)(6) FOR FAILURE TO STATE A CLAIM**

---

[21]   Jurisdiction upon removal is derivative in nature and does not exist if the state court from which the action is removed lacks jurisdiction.  *Minnesota v. United States*, 305 U.S. 382, 389 (1939).  "[T]he federal court acquires [no jurisdiction] upon removal, even though in a like suit originally brought in federal court, the court would have had jurisdiction." *Colorado v. Nord*, 377 F. Supp. 2d 945, 949 (D. Colo. 2005) (quoting *Smith v. Cromer*, 159 F.3d 875, 879 (4th Cir. 1998)); *see also Lambert Run Coal Co. v. Balt. & Ohio R.R.*, 258 U.S. 377, 382 (1922); *Crow v. Wyo. Timber Prods. Co.,* 424 F.2d 93, 96 (10th Cir. 1970); *Gentry-Smith v. Saul*, 19-CV-04055-EFM, 2019 WL 6117966, at *1 (D. Kan. Nov. 18, 2019).

If the Court finds that the United States has unequivocally waived its sovereign immunity as to claims brought under the FCRA, Plaintiff's State Court Petition should be dismissed on alternative grounds.   First, Plaintiff has failed to plead facts sufficient to support his claims. Second, assuming *arguendo* Plaintiff's State Court Petition satisfies the pleading requirements, MOHELA's furnishing of Plaintiff's credit information, on the Department's behalf, was accurate, thus barring any claim under the FCRA.   I.e., the FCRA does not prohibit historical account information from appearing on a consumer credit report.   Plaintiff paid his loans in full while in default—but paying off a student loan debt does not trigger a so-called, "clean slate," whereby the furnisher is obligated to delete historic negative reporting.   Third, and at the very least, Plaintiff failed to plead any cause of action for "willful" violation of the FCRA.

### A.   Plaintiff has Failed to Plead a Plausible Claim that his Consumer Credit File Contains Inaccurate or Incomplete Information

When a plaintiff fails to plead all the elements of a cause of action, fails to plead facts supporting the elements, and states the claim in a vague or ambiguous manner, the court may dismiss the complaint.[22]   "A furnisher of information is entitled to summary judgment if it conducts a reasonable investigation based upon the information regarding the dispute provided by the consumer reporting agency, concludes that there is no evidence its information is inaccurate, and

---

[22]   *See e.g., Ritchie v. TRW, Inc.*, 953 F.2d 1392 (10th Cir. 1992) ("Having failed to even allege that the defendants-appellees prepared a report containing inaccurate information, we hold that the Ritchies failed to state a cause of action under the FRCA.")*; Cox v. Transunion, Inc.*, No. 03-4160-JAR, 2003 WL 22245323, at *1 (D. Kan. Sept. 26, 2003) (dismissing complaint where plaintiff failed to allege specific facts "supporting Plaintiff's allegations that Defendant ignored" the FCRA); *Howard v. Blue Ridge Bank*, 371 F. Supp. 2d 1139, 1143 (N.D. Cal. 2005) (dismissing plaintiff's claim for willful noncompliance with the FCRA because the court found that, where the plaintiff made a conclusory statement that the defendant furnishers of credit information received notice of the plaintiff's dispute from various credit reporting agencies, the allegation was insufficient to sustain an action for a violation of § [1681s-2(b)]).

accurately reports its findings to the consumer reporting agencies." *Ware v. Bank of America Corp.*, 9 F. Supp. 3d 1329, 1338 (N.D. Ga. 2014).

Here, Plaintiff has failed to state a claim under § 1681s-2(b) because he did not allege any facts that would show that he has a plausible claim that his consumer credit file contains inaccurate or incomplete information regarding his federal student loans.

In this arena, Plaintiff pleads only that—

32)    The issue, as set forth in Plaintiff's written dispute, was that TransUnion was reporting two delinquent tradelines simultaneously for the same account, for four different accounts …

State Court Pet. for Damages, Doc. 5, at 6.

It is a far cry from improper that Plaintiff's several student loans appear separately on his credit report.  In fact, 20 U.S.C. 1080a, Reports to Consumer Reporting Agencies and Institutions of Higher Education, is written so as to require the "the Secretary or the guaranty agency, eligible lender, or subsequent holder" disclose certain information to the reporting agencies "with respect to any loan . . .." 20 U.S.C. § 1080a(a).  As to each individual education loan, USDOE or its servicer is required to furnish the consumer reporting agencies within the total amount of loans and remaining balances, information regarding repayment status, dates of default, and dates of cancellation, among other requirements.  20 U.S.C. § 1080a(a).  Thus, it is neither surprising nor improper that Plaintiff finds his historic negative delinquencies across multiple student loans to appear separately on his credit report.  Plaintiff has failed to point to any inaccuracies or false information furnished by USDOE, nor can he.  The furnished information about Plaintiff's federal student loans is accurate.

In *George v. Chex Sys., Inc.*, this Court, facing a similar argument from a plaintiff seeking redress against a furnisher for reporting historically accurate information, found plaintiff failed to

state a claim. *George v. Chex Sys., Inc.,* No. 16-2450-JTM, 2017 WL 119590 at *3 (D.Kan. Jan. 12, 2017).  In *George*, the plaintiff attempted to distinguish *Abeyta* "by arguing that he does not seek total removal of the derogatory information (i.e., the charge-off), but wants [defendant] to update (or complete) the status of the trade line with a notation that the debt was discharged in bankruptcy and the balance is zero. *Id.*; *compare Abeyta v. Bank of Am.,* 2016 WL 1298109, at *2 (D. Nev. Mar. 31, 2016).  Plaintiff's request shows that he challenges the Report's completeness, not its accuracy." *Id*.  The Court goes on to find that the plaintiff in *George*, did not bring a "completeness" claim.

Section 1681e, however, does not specifically reference "completeness." But § 1681i does, stating:

if the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency directly ... the agency shall ... conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information ... unless [it has] reasonable grounds to believe that [the dispute by the consumer] is frivolous or irrelevant.

15 U.S.C. § 1681i(a)-(c). Plaintiff has not filed a claim under § 1681i, and even had he done so, it would have failed because he did not first notify Chex of the alleged inaccuracy.

*George*, 2017 WL 119590, at *3.  Similarly, if Plaintiff is here attempting to construe his allegations as a type of "completeness," rather than an "accuracy" FCRA claim, he did not notify USDOE regarding completeness issues. *See* Plaintiff Credit Dispute Letter, Ex. M.

Plaintiff has failed to allege any facts regarding his student loans or payment history that could show that he has a plausible claim that an error exists on his credit report.  Plaintiff has also not alleged any plausible facts—other than conclusory allegations—explaining how the USDOE allegedly failed to conduct a reasonable investigation, failed to review all relevant information,

failed to report the results of its investigation to the credit bureaus, or failed to correct any inaccuracies or incomplete information.[23]

Moreover, contrary to Plaintiff's pleading, Plaintiff's written dispute letter makes no mention of the improper simultaneous delinquencies he pleads in his State Court Petition. Ex. M. Rather, Plaintiff's Credit Dispute Letter appears to seek deletion of historic negative reporting because Plaintiff later paid in full:

> The following information needs to be reinvestigated and changed:
>
> > 1. The Trade Lines pertaining to MOHELA/Dept of Ed ending in *0005; *0002; *0001; and *0003 were paid in full. On your report, it shows as "over 120 days past due" and "transferred or sold."
>
> I have included the letter from the creditor wherein it states when the accounts were paid in full, as well as a copy of the page with the erroneous credit report
> .

Plaintiff Credit Dispute Letter, Ex. M.  To the extent Plaintiff's prior notice sought corrective action for a wholly different reason (one similarly without merit) than that which he now raises, Plaintiff has failed to plead improper withholding of corrective action under 15 U.S.C. § 1681 and like claims.  Plaintiff has stated only bare, conclusory restatements of the law, and has failed to sufficiently plead a plausible claim that his consumer credit file contains inaccurate or incomplete information regarding his federal student loans.

---

[23]   *See Abeyta v. Bank of Am.,* 215CV02320RCJNJK, 2016 WL 1298109, at *2 (D. Nev. Mar. 31, 2016) (finding plaintiff's FCRA claim failed to allege an "actual falsity" with in her credit report which included the historical debt, regardless that the debt had been discharged in bankruptcy); *George v. Chex Sys., Inc.,* 16-2450-JTM, 2017 WL 119590, at *3 (D. Kan. Jan. 12, 2017); *Hunt v. JPMorgan Chase Bank, Nat'l Ass'n,* 770 F. App'x 452, 458 (11th Cir. 2019) (stating that "[a] plaintiff must show a factual inaccuracy rather than the existence of disputed legal questions to bring suit against a furnisher under § 1681s-2(b)"); *see also Peart v. Shippie,* 345 F. App'x 384, 386 (11th Cir. 2009) (concluding "from the record that Peart's complaint fails to state a claim under the FCRA because it does not allege[]…that Wells Fargo failed to conduct an investigation into Peart's credit history after being notified of a dispute by a credit reporting agency.").

**B.**      **Data Furnishers Are Not Prohibited from Reporting Historically Accurate Information Under the FCRA**

Examining the State Court Petition (Doc. 5, 3-27) in addition to Plaintiff Credit Dispute Letter (Ex. M), it is not particularly clear what Plaintiff alleges is inaccurate on his credit report. As addressed above, historic negative delinquencies across multiple student loans were properly furnished to the credit reporting agencies.   It may be the case that Plaintiff seeks removal of historically accurate information regarding his past delinquencies.

Federal district courts across the country have rejected similar suits.   For example, the Southern District of Texas granted a motion to dismiss similar claims in *Martin v. Equifax Info. Servs., LLC*, No. 4:19-CV-3691, 2020 WL 1904496 (S.D. Tex. Apr. 17, 2020).   In *Martin*, the plaintiff argued that because the account was charged off, she was no longer required to pay according to the original terms of the contract. *Id*. at *1. The *Martin* court rejected Plaintiff's position and granted the furnisher-defendant's motion to dismiss, finding that "with such additional notations that the account had been charged off and closed, the disputed trade line was not so misleading as to be inaccurate… such a reporting of a historical monthly payment amount is far from misleading to the point of 'adversely affect[ing] credit decisions,' as the charged off and closed notations would indicate that the monthly amounts were no longer due on an ongoing basis." *Id*. at *2,[24]

---

[24]      See *also Gonzalez v. Experian Info. Sols., Inc.,* 2005 WL 925657, at *3 (D. Utah Apr. 20, 2005) ("Defendants, however, cannot be held liable for reporting accurate credit information."); *Rodriguez v. Trans Union LLC*, No. 1:19-CV-379, 2019 WL 5565956, at *3 (W.D. Tex. Oct. 28, 2019) (finding credit report was not inaccurate where report stated that $345 was paid per month, but account was also closed, charged off, paid in full, and had $0 balance); *Meeks v. Equifax Info. Servs., LLC*, No. 1:18-CV-3666, 2019 WL 1856411, at *5-6 (N.D. Ga. Mar. 4, 2019) (finding credit report which included monthly payment amount was not inaccurate because report also stated balance was $0, status was charged off, account was closed, and debt was sold to another company); *Gibson v. Equifax Info. Servs., LLC*, No. 5:18-cv-00465, 2019 WL 4731957, at *4 (M.D. Ga. July 2, 2019) (finding credit report was not inaccurate where monthly payments

Similarly, in *Cowley v. Equifax Information Services*, the plaintiff alleged that the furnisher violated the FCRA by reporting a tradeline with a "scheduled monthly payment" of $32.00 "when the account was, in fact, paid and closed." *Cowley v. Equifax Info. Services, LLC*, 2019 WL 4936036, at *1 (W.D. Tenn. Aug. 12, 2019), *reconsideration denied*, 2019 WL 5310205 (W.D. Tenn. Oct. 21, 2019).  As in the present case, the plaintiff in *Cowley* alleged that the furnisher negligently or willfully failed to adequately investigate her dispute and "review all relevant information available to it and provided by Equifax and Trans Union." *Id.* at *2-3.  The furnisher argued that there was no FCRA violation if "the information contained in a challenged credit report was accurate on its face, or . . . 'technically accurate,'" *Id.* at *3.  The court found in favor of the furnisher because regardless of the definition of "inaccurate" that it applied, the court concluded that the report was accurate because the $32 was the correct scheduled monthly payment amount while the account was active. *Id.*  The court further found the historical payment information did not amount to an inaccuracy or incompleteness to sustain the FCRA claim under 15 U.S.C. § 1681s-2(b)(1), and the claim failed as matter of law. *Id.*

Consistent with these decisions, the reporting of Plaintiff's student loan account (such as the past due delinquent status) is neither misleading nor inaccurate.  Critically, Plaintiff does not dispute that his account was in fact delinquent.  Rather, he is likely under the false impression that because he paid off his student loan debt, the historical negative information should be deleted.

---

included, but accounts shown as closed and balances were $0); *Euring v. Equifax Info. Servs., LLC*, No. 19-CV-116752020, 2020 U.S. Dist. LEXIS 54576, *13-17 (E.D. Mich. Mar. 30, 2020) (finding that plaintiff's claim failed because the historical scheduled monthly payment was not inaccurate despite a reported zero balance); *Burrow v. Equifax Info. Servs.*, 1:18-cv-05134-JPB-LTW, 2019 U.S. Dist. LEXIS 185692, at *27 (N.D. GA Aug. 5, 2019) (finding that it was not misleading to report the historical terms of a debt that has been charged off and is no longer being collected by the creditor; on the contrary, it accomplishes one of the intended purposes of the FCRA.).

Similarly, a tradeline is made up of numerous reporting fields, including but not limited to date of first delinquency, date reported, and date closed, but of course, Plaintiff omits that information in his State Court Petition because it would further bolster that the tradelines were not misleading or inaccurate.  Without alleging an actual inaccuracy, Plaintiff cannot maintain his FCRA claims.[25]

## C.    Plaintiff's Claim of Willfulness Under FCRA Should be Dismissed

Section 1681n(a) of the FCRA provides that "[a]ny person who willfully fails to comply with any requirement imposed under this subchapter with respect to any consumer is liable to that consumer." 15 U.S.C. § 1681n(a).  The Tenth Circuit has defined a willful violation under the FCRA:

> A "willful" violation is either an intentional violation or a violation committed by an agency in reckless disregard of its duties under the FCRA. *See Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57–58, 127 S.Ct. 2201, 167 L.Ed.2d 1045 (2007). Recklessness is measured by "an objective standard: action entailing an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Id*. at 68, 127 S.Ct. 2201 (internal quotation marks omitted). "[A] company subject to FCRA does not act in reckless disregard of it unless the action is not only a violation under a reasonable reading of the statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Id*. at 69, 127 S.Ct. 2201.

---

[25]    USDOE is a federal agency and not a consumer reporting agency under 15 U.S.C. § 1681a, as it does not assemble or evaluate consumer information, nor does it prepare or furnish consumer reports.  Rather, USDOE's credit reporting functions are limited to furnishing repayment information to credit reporting agencies consistent with requirements outlined in the HEA and FCRA.  As such, once a loan is paid in full and the Department ceases reporting on that loan, the discretion to delete or manipulate a historical tradeline falls squarely on the credit reporting agencies, not the USDOE.

*Birmingham v. Experian Info. Sols., Inc.*, 633 F.3d 1006, 1009 (10th Cir. 2011).[26]   A defendant

willfully violates the FCRA when it does so knowingly, or when it recklessly disregards its

statutory duties.[27]

Plaintiff does not state a claim for willful noncompliance with the FCRA because his State

Court Petition does not contain a single fact supporting USDOE's allegedly willful noncompliance

with the FCRA.   Plaintiff claims that "TransUnion responded to Plaintiff's dispute, failing to

correct the issue." State Court Pet. for Damages, Doc. 5, at 6.   Plaintiff further alleges that

"TransUnion was reporting two delinquent tradelines simultaneously for the same account, for

four different accounts…," which differs from what Plaintiff alleged in his April 8, 2021 dispute

letter to MOHELA. *Id.*   From this, Plaintiff concludes that USDOE was willfully noncompliant

with the FCRA and simply recites the elements found in § 1681s-2(b).   None of these allegations

support the notion that USDOE's actions were knowing and intentional or in a "conscious

disregard" of his rights.   Thus, at a minimum, Plaintiff fails to state a claim for willful

noncompliance under the FCRA.

---

[26]   Although the *Birmingham* panel denied defendant's motion to dismiss on willfulness, it could do so because the court could "infer defendant's inaccurate reporting resulted from willful or reckless disregard" at the motion to dismiss stage.   The instant case should be distinguished because Plaintiff has not and cannot pinpoint an inaccuracy.

[27]   *Pembroke v. Trans Union, LLC*, No. 16-CV-03194, 2017 WL 8897173, at *9 (D. Colo. Oct. 27, 2017), *report and recommendation adopted*, No. 16-CV-03194, 2017 WL 6463254 (D. Colo. Dec. 19, 2017) (citing *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57 (2007)); *see also id.* at 69 ("[A] company subject to FCRA does not act in reckless disregard of it unless the action is not only a violation under a reasonable reading of the statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless."); *Johnson v. Equifax, Inc.*, 510 F.Supp.2d 638, 648 (S.D. Ala. 2007) ("The mere existence of inaccuracies in a consumer report does not in itself amount to an act in conscious disregard of the plaintiff's rights supporting a finding of willful noncompliance."); *Richardson v. Fleet Bank*, 190 F.Supp.2d 81, 89 (D. Mass. 2001) (granting summary judgment in favor of Equifax and reasoning that "plaintiffs' contention that Equifax failed to correct an error in their credit reports after receiving several notices does not constitute evidence of a willful violation").

For these reasons set forth above, USDOE respectfully requests the Court grant the motion to dismiss Plaintiff's complaint under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction, or alternatively under Fed. R. Civ. P. 12(b)(6) for failure to state a claim.

Respectfully submitted,

DUSTON J. SLINKARD
Acting United States Attorney
District of Kansas

s/ Steven W. Brookreson, II
STEVEN W. BROOKRESON, II
Assistant United States Attorney
Ks. S.Ct. No. 28106
500 State Avenue
Suite 360
Kansas City, Kansas 66101
PH: (913) 551-6730
FX: (913) 551-6541
Email: steven.brookreson@usdoj.gov

s/ Christopher Allman
CHRISTOPHER ALLMAN
Assistant United States Attorney
Ks. S. Ct. No. 14225
500 State Avenue, Suite 360
Kansas City, Kansas 66101
PH: (913) 551-6730
FX: (913) 551-6541
Email: chris.allman@usdoj.gov

Attorneys for the Defendant United States
Department of Education

## CERTIFICATE OF SERVICE

I hereby certify that on December 14, 2021, the foregoing was electronically filed with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

s/ Steven W. Brookreson, II
STEVEN W. BROOKRESON, II
Assistant United States Attorney